UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
SID BERNSTEIN PRESENTS, LLC,                         :
                                                      :
                              Plaintiff,              :
                                                      :
              -against-                               :                    MEMORANDUM DECISION
                                                      :                    AND ORDER
APPLE CORPS LIMITED and                               :
SUBAFILMS LIMITED,                                    :                    16 Civ. 7084 (GBD)
                                                      :
                              Defendants.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
GEORGE B. DANIELS, United States District Judge:

Plaintiff Sid Bernstein Presents, LLC ("SBP") brought this action against Defendants Apple Corps Limited ("Apple Corps") and Subafilms Limited ("Subafilms"), alleging copyright infringement in violation of 17 U.S.C. § 101 *et seq.* and seeking various forms of declaratory relief. (Compl., ECF No. 1, at 1.) SBP is the owner by assignment of all the intellectual property rights of the late music producer Sid Bernstein. (Compl. ¶¶ 8-9.) Apple Corps was founded by members of The Beatles, and Subafilms is its subsidiary. (*Id.* ¶¶ 2-3.)

Defendants moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Defs.' Mot. Dismiss, ECF No. 19.) Defendants also moved for sanctions. (Defs.' Mot. Sanctions, ECF No. 25.) Defendants' motion to dismiss the Complaint is GRANTED. Defendants' motion for sanctions is DENIED.

## I.   FACTUAL BACKGROUND

Sid Bernstein, who died in 2013 at the age of 95 after a long career, was a highly successful promoter and producer of performances by many rock groups, musicians, and performers, including The Beatles, The Rolling Stones, The Rascals, Herman's Hermits, Tony Bennett, Ella

Fitzgerald, James Brown, and others. (Compl. ¶ 9.) The present litigation concerns Bernstein's involvement in The Beatles' historic concert at Shea Stadium.

According to the Complaint, Bernstein came up with the idea for the Shea Stadium concert and proposed it to The Beatles' manager, Brian Epstein.[1] (*Id.* ¶ 11.) In April 1965, Bernstein and Epstein executed a contract through which Epstein's management company, Nems Enterprises, Ltd. ("Nems"), agreed to furnish "[t]he services of THE BEATLES plus complete supporting show" for an August 15, 1965 concert at Shea Stadium. (Kolcun Decl., ECF No. 21, Ex. A ("Nems-Bernstein Contract"), at 1.) The contract provided that Nems "shall have the sole and exclusive right to photograph, film, video-tape, and/or record the performances of THE BEATLES and the entire supporting show during this engagement and any receipts derived therefrom shall belong exclusively to [Nems]." (Compl. ¶ 11; Nems-Bernstein Contract ¶ 4.) In addition, Bernstein agreed "to exclude from the premises and particularly from the immediate vicinity of the stage and the backstage areas all TV cameras, and/or photographers with motion picture cameras and/or tape recorders unless specifically authorized by [Nems]." (Nems-Bernstein Contract ¶ 4.)

After signing the contract, Bernstein "set to work raising the money to mount the performance, which included, among other things, renting Shea Stadium, building a stage, hiring security, hiring the opening acts, and paying the Beatles their minimum performance fee."

---

[1] The following factual allegations are taken from the Complaint (or documents attached to it or incorporated by reference) and are deemed to be true for purposes of a motion to dismiss. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). This Court also draws from the exhibits attached to the Declaration of Michael A. Kolcun in Support of Defendants' Motion to Dismiss ("Kolcun Decl."), ECF No. 21. These materials are cognizable on the instant motion to dismiss because they are either incorporated by reference or are "integral" to the Complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Wilson v. Dynatone Publ'g Co.*, No. 16 Civ. 104, 2017 WL 1330336, at *1 n.1 (S.D.N.Y. Apr. 10, 2017).

(Compl. ¶ 12.)[2]  Bernstein also arranged for TV personality Ed Sullivan to introduce The Beatles at the concert.  During this same period, Epstein arranged for Sullivan's camera crew to film and record the planned performance, with Bernstein's knowledge and consent.  (*Id.* ¶ 14.)

Bernstein attended the concert on August 15, 1965 and observed the filming and recording of the performances by The Beatles and the opening acts.  Bernstein also introduced Sullivan to the audience, who introduced The Beatles.  (*Id.* ¶ 16.)

Nems retained custody of the unedited film of the concert (*i.e.*, the raw audiovisual footage, which the Complaint refers to as the "Master Tapes").  (*Id.* ¶ 18.)  Thereafter, Nems and Sullivan's production company, Sullivan Productions, Inc., used the raw footage to produce a movie entitled *The Beatles at Shea Stadium* (the "Movie"), which was broadcast nationwide on the ABC television network in January 1967.  (*Id.* ¶¶ 18-19.)

U.S. Copyright Office records indicate that Nems acquired all right, title, and interest, including copyright, in the Movie pursuant to an agreement made in August 1965 between Nems and Sullivan Productions.  (*Id.* ¶ 20.)  Those records also indicate that in 1988, Subafilms registered its claim of ownership of the copyrights in the Movie, which it obtained by assignment from the named author, "Nems Enterprises Ltd. as employer for hire."  (*Id.* ¶ 21.)

In or about 1995, Defendants arranged for and authorized the television broadcast of a documentary series on The Beatles' career called *The Beatles Anthology* ("*Anthology*"), which

---

[2] The Complaint alleges that, in addition to coming up with the idea for the concert, Bernstein: "planned, managed and paid for virtually every aspect of the production, including deciding on, booking and paying to rent Shea Stadium; paying the Beatles and other artists to perform; arranging and paying for security and insurance; deciding on the location, and placement of the stage within Shea Stadium; determining the placement, orientation and arrangement of the band members and microphones; deciding on and coordinating the introduction of the Beatles by Ed Sullivan; deciding on and arranging for the Beatles to enter Shea Stadium by helicopter; deciding on and coordinating the Beatles' entrance to the stage from the dugout and their exit from the stadium by limousine; and paying for the helicopter and limousine." Bernstein also designed the tickets and had a promotional poster made. (Compl. ¶ 15.)

aired in November 1995. (*Id.* ¶ 22.) In 1995 and 1996, Defendants arranged for and authorized the release, distribution, offer for sale, and sale of the *Anthology* series on VHS and Laserdisc, as well as *Anthology* CDs. (*Id.* ¶¶ 23-24.)[3] In 2003, Defendants arranged for the release on DVD. (*Id.* ¶ 25.) The *Anthology* DVDs, Laserdiscs, and VHS cassettes included audiovisual footage from the "Master Tapes" and/or the Movie, and the *Anthology* CDs included the audio recording of the song "Everybody's Trying To Be My Baby." (*Id.* ¶ 26.)[4] Defendants have also continued to distribute and sell the *Anthology* products, including via the beatles.com website, Amazon, and eBay. (*Id.* ¶ 27.)

Around 2010, Defendants provided a copy of footage from the "Master Tapes" and/or the Movie to be used in a film entitled *The Last Play at Shea*. (*Id.* ¶ 28.) Defendants also authorized and began offering streaming excerpts from the "Master Tapes" and/or the Movie from the beatles.com website over the Internet. (*Id.* ¶ 29.)[5]

Plaintiff alleges that it learned in 2015 that Subafilms had a registered copyright claim in the Movie, and that Subafilms claimed to own the copyrights in the Movie by assignment from Nems. (*Id.* ¶ 30.)[6] In 2016, Plaintiff learned that the television broadcast of the *Anthology* series as well as *Anthology* DVDs, Laserdiscs, and VHS cassettes included footage from the 1965 Shea

---

[3] On December 20, 1996, copyright registration for the full CD was obtained solely in the names of Apple Corps and EMI Records, Ltd. (*See* Kolcun Decl., Ex. E.) The product packaging also contains a notice listing Apple Corps and EMI as copyright owners. (*See id.*, Ex. F.) Courts in this District have considered documents indicating dates of copyright registrations that were attached to a defendant's motion to dismiss. *See, e.g.*, *Wilson*, 2017 WL 1330336, at *2.

[4] Apple Corps registered copyrights in these products on November 28, 1995, October 29, 1996, and October 6, 2003. (*See* Kolcun Decl., Exs. G, H, I, J, K.)

[5] The beatles.com website contains a copyright notice in the names of Apple Corps and Subafilms. (*See id.*, Ex. L.)

[6] Plaintiff also alleges that it learned in 2015 that the beatles.com website streamed footage and audio recording material from the 1965 concert and that *The Last Play at Shea* included footage from the concert. (Compl. ¶¶ 33-34.)

Stadium concert. (*Id.* ¶ 31.) Also in 2016, Plaintiff learned that *Anthology* CDs included the audio recording from The Beatles' performance of the song "Everybody's Trying To Be My Baby" at the 1965 concert. (*Id.* ¶ 32.)

In July 2016, Apple Corps announced the release of the film *Eight Days a Week: The Touring Years*. (*Id.* ¶ 35.)[7] That same month, Plaintiff submitted an application to register its ownership of copyrights in the "Master Tapes" of the 1965 concert. (*Id.* ¶ 36.) The Copyright Office refused Plaintiff's application because, *inter alia*, Plaintiff's claim was adverse to Subafilms' 1988 registration in the Movie. (*Id.* ¶ 37.)

## II.   LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires pleading facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. The court then considers whether plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.* In deciding the 12(b)(6) motion, the court also

---

[7] The Complaint asserts that Defendants also planned to release a 30-minute in-theatre film of the 1965 concert. (*Id.* ¶ 35.) However, Plaintiff's opposition brief acknowledges confusion as to whether the 30-minute film would be released as a separate film or as part of *Eight Days a Week*. (Pl.'s Mem. L. Opp'n Defs.' Mot. Dismiss ("Opp'n Mem."), ECF No. 24, at 3 n.1.)

draws all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119-20 (2d Cir. 2013).

A court deciding a Rule 12(b)(6) motion is not limited to the face of the complaint. A court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

### III.    THE COMPLAINT IS DISMISSED FOR FAILING TO STATE A CLAIM

Plaintiff's claims rely on two related but distinct theories. First, Plaintiff argues that Bernstein was a copyright author "[b]y reason of being the producer of and having made creative contributions to the 1965 Shea Stadium performance." (Compl. ¶ 41.) Second, Plaintiff argues that Bernstein was "the employer for hire of the Beatles and the opening acts, who performed at his instance and expense." (*Id.*) Plaintiff seeks rights regarding various "infringing derivative works" including: (1) *The Beatles Anthology*; (2) *The Last Play at Shea*; and (3) *Eight Days a Week*. For the reasons that follow, all of Plaintiff's claims must be dismissed.

#### a.    Contract

"A fundamental precept of contract law is that agreements are to be construed in accordance with the parties' intent," "[t]he best evidence" of which "is what they say in their writing." *In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 122 (2d Cir. 2014) (citation omitted). "Accordingly, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.* (citation omitted); *see also Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) ("When

interpreting a contract [under New York law], the 'intention of the parties should control, and the best evidence of intent is the contract itself.'") (citation omitted).

Bernstein entered into a contract with The Beatles' management company, Nems, on April 26, 1965, approximately four months before the Shea Stadium concert. That contract reserves no rights whatsoever for Bernstein in any filming or recording of the concert. To the contrary, the contract granted Nems "the sole and exclusive right to photograph, film, video-tape, and/or record the performances of THE BEATLES and the entire supporting show during this engagement and any receipts derived therefrom shall belong exclusively to" Nems. (Nems-Bernstein Contract ¶ 4.) Furthermore, the contract required Bernstein to "exclude . . . all TV cameras, and/or photographers with motion picture cameras and/or tape recorders unless specifically authorized by [Nems]." *Id.* Thus, the sole contract between Bernstein and Nems reserved filming rights and sales for Nems and expressly excluded Bernstein from any involvement.

An August 1965 contract between Nems and Sullivan Productions sheds additional light on the parties' understanding of copyrights relating to the Shea Stadium concert. The agreement stated that Sullivan Productions, as an independent contractor, would provide to Nems a "one-hour television film . . . (herein the "Film"), consisting of complete coverage of the performance of the Beatles at their Shea Stadium Concert . . . ." (Kolcun Decl., Ex. B ("Nems-Sullivan Contract"), ¶ 1.)[8] The agreement also expressly provided that Nems "shall be copyright proprietor of the Film," that the Film and "all rights therein" were Nems's "sole property," and that Nems retained the right "to exploit the Film in any manner, in any media throughout the world in perpetuity." (*Id.* ¶¶ 4, 8.) As such, both the Nems-Bernstein and Nems-Sullivan contracts are plainly consistent with the notion that Nems exclusively owned all copyrights in the filming of the concert.

_____

[8] The Complaint acknowledges that Bernstein "knew of and approved the filming and recording of the performance by Mr. Sullivan's crew." (Compl. ¶ 14.)

Nevertheless, Plaintiff tries to avoid the effect of these agreements by arguing that they relate only to the live filming of the concert, but "do not negate" Bernstein's rights to the raw footage of the concert—the so-called "Master Tapes." (*See* Opp'n Mem. at 5, 7-8.)  This reading of the Nems-Bernstein Contract strains credulity and is totally inconsistent with the conduct of the relevant parties in the decades following.

### b.  Statute of Limitations

Under 17 U.S.C. § 507(b), civil lawsuits under the Copyright Act must be brought "within three years after the claim accrued."  A copyright ownership claim "accrues only once, when 'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.'"  *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (citation omitted).  "By contrast, an infringement action may be commenced within three years of *any* infringing act, regardless of any prior acts of infringement."  *Id.* (emphasis in original).

The relevant dates in this case are as follows.  On April 26, 1965, Bernstein executed a contract with Nems arranging for an August 15, 1965 concert.  The *Beatles at Shea Stadium* Movie was broadcast nationwide in 1967, bearing a copyright notice in the name of Nems Enterprises Ltd.  (*See* Kolcun Decl., Ex. C.)  In March 1988, Defendant Subafilms obtained copyright registration for the Movie solely in its name, designating the author as "Nems Enterprises Ltd. as employer for hire."  (Compl. ¶ 21.)

According to this basic chronology, Bernstein's copyright claim accrued no later than March 1991, three years after Subafilms obtained copyright registration for the Movie.  *See Kwan*, 634 F.3d at 228 (finding that an "express assertion of sole authorship or ownership" triggers the accrual of an ownership claim).  But it is undisputed that Bernstein did not assert any rights to the concert footage before his death in 2013, even as Defendants continued to release derivative works

over a roughly twenty-year period. (*See* Feb. 8, 2017 Oral Arg. Tr. ("Oral Arg. Tr."), ECF No. 39, at 71.) Each time, Defendants obtained copyright registration and accompanied the work with a notice listing Apple Corps as the copyright owner. (*See* Kolcun Decl., Exs. E-L.) These repeated repudiations put Bernstein "amply on notice decades ago of [Defendants'] claims to own those copyrights." *Wilson*, 2017 WL 1330336, at *1. Accordingly, Plaintiff's lawsuit is "quite untimely." *Id.* at *6.

To try to avoid this result, Plaintiff relies heavily on *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1967 (2014), which held that the equitable defense of laches could not bar an infringement claim brought within the three-year statute of limitations in 17 U.S.C. § 507(b). But *Petrella* only addressed the timeliness of infringement (as opposed to ownership) claims, as that plaintiff was the undisputed "sole owner of the copyright" in the work at issue. *Id.* at 1971. A different framework applies in cases like this one, where an "infringement claim cannot be decided without adjudication of a genuine dispute as to the plaintiff's ownership of the copyright." *Kwan*, 634 F.3d at 226. In *Kwan*, the Court of Appeals held that where an ownership claim is time-barred, "any attendant infringement claims must fail" if "ownership is the dispositive issue" and "forms the backbone" of the infringement claim. *Id.* at 229-30. The Court of Appeals reaffirmed that decision after *Petrella* in *Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016), holding that the plaintiff "could not revive the time-barred claim of ownership of a copyright interest by relying on the defendants' continued exploitation of the copyright within three years of his filing suit."

The basis for SBP's Complaint is the claim that "Bernstein was the dominant, and hence the sole, author of the underlying work embodied in the Master Tapes and sole owner of copyright therein." (*See* Compl. ¶ 39.) Just as in *Kwan*, the dispute involves who was the author of the work

in the first place—whether Bernstein's editorial contributions "were significant enough to qualify [him] as the author and therefore owner of the copyright." *Kwan*, 634 F.3d at 229. As such, "*Kwan* controls this case." *Simmons*, 810 F.3d at 116. Because Bernstein's ownership claim arose, at the latest, by 1991, it was surely time-barred by the time SBP filed suit in 2016. Accordingly, both the ownership and attendant infringement claims must fail.

Plaintiff also argues that Defendants' registered copyright in the Movie does not encompass the raw footage from which the film was made. (*See* Opp'n Mem. at 4-6.) This argument is similar to the one posed in *Mahan v. Roc Nation, LLC*, No. 14 Civ. 5075, 2015 WL 1782095, at *5 (S.D.N.Y. Apr. 15, 2015), *aff'd*, 634 F. App'x 329 (2d Cir. 2016), in which the plaintiff sought rights to "unpublished recordings created in connection with" several released music albums. Although the defendant recorded copyrights in three separate registrations, none of which mentioned plaintiff as a joint copyright holder, the plaintiff argued that defendants' rights did not encompass the unpublished works. *Id.* at *3-5. The court called this argument "incorrect," noting that courts "have 'consistently rejected' the 'notion that a copyright owner is required to separately register every draft or version of an evolving work', as '[s]uch a requirement would be wasteful and impractical.'" *Id.* at *5 (quoting *Peterson v. Kolodin*, No. 13 Civ. 793, 2013 WL 5226114, at *6 (S.D.N.Y. Sept. 10, 2013)). The court therefore agreed with defendant that "it owns the copyrights to the unpublished works as 'derivative' or 'underlying' parts of the Albums." *Id.*; *see also 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (holding that production company, which agreed with screenwriter to create film, owned the copyright in both the finished film and the "raw film footage"); *Peterson*, 2013 WL 5226114, at *6 (holding that copyright registration for the final version of a recording is sufficient to support an infringement action against defendant claiming rights to original unedited takes).

As the Copyright Office correctly found in this case, SBP's claim to a copyright in the raw footage is adverse to Subafilms' registered copyright in *The Beatles at Shea Stadium* Movie. *See Garcia v. Google, Inc.*, 786 F.3d 733, 741 n.7 (9th Cir. 2015). It is therefore not surprising that Bernstein himself never asserted authorship rights in the "Master Tapes" work during his lifetime. (Oral Arg. Tr. at 69.)

### c.  Copyright Ownership

While the Complaint could be dismissed solely for the reasons already stated, for the avoidance of doubt, this Court will also address Plaintiff's remaining arguments under the Copyright Act.[9]  SBP has failed to bring a cognizable copyright claim under any theory.

### i.  Dominant or Joint Authorship

To obtain protection under the Copyright Act, a work must be:  (1) "in the form of a 'writing,' i.e., it must be fixed in some tangible form from which the work can be reproduced"; and (2) "a product of original creative authorship." *Prestige Floral, Societe Anonyme v. Cal. Artificial Flower Co.*, 201 F. Supp. 287, 289 (S.D.N.Y. 1962) (quoting report summarizing recent cases).[10]  These fixation and authorship requirements derive from Art. I, § 8, cl. 8 of the Constitution, which gives to Congress the power to protect the "Writings" of "Authors." *See 16 Casa Duse*, 791 F.3d at 258 ("Authors are not entitled to copyright protection except for the 'works of authorship' they create and fix."); 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 1.08 (Matthew Bender rev. ed. 2017) ("A work is not written if it is not recorded in

---

[9] Works created prior to 1978, like *The Beatles at Shea Stadium* Movie, are governed by the 1909 Copyright Act. *See* 17 U.S.C. § 301(b)(2); *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 553 (2d Cir. 1995).

[10] *See also* 17 U.S.C. § 102(a) ("Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression"); *United States v. Martignon*, 492 F.3d 140, 151 (2d Cir. 2007) ("the Copyright Act gives the author an extensive bundle of rights in his fixed work").

some manner . . . . [Thus] the *performance* of a play, musical composition, or other work cannot in and of itself be regarded as a writing capable of copyright protection.") (emphasis in original).

SBP's claim to copyright in this case "presents somewhat of a conundrum." *Thomson v. Larson*, 147 F.3d 195, 205 (2d Cir. 1998). On the one hand, SBP concedes that a copyrightable work must be "fixed in a tangible form of media," and therefore "if the concert had not been recorded there would have been no copyrightable work because there would have been no fixation." (Oral Arg. Tr. at 31.) On the other hand, SBP appears to argue that Bernstein's copyright derives from his efforts to produce and promote the concert performance, *not* his contributions to the "Master Tapes" or the Movie. (*See id*. at 44-45) (disagreeing with the proposition that the copyrightable work is the filming of the concert, not the concert itself); (*id.* at 29) (stating that the concert "was a tangible copyrightable work that was fixed or embodied in the footage in the Master Tapes"); (*see also* Opp'n Mem. at 13-14.)

SBP's argument may be a tacit concession that Bernstein was really not involved at all in the filming of the concert, which is fatal to its copyright claims. The 1965 concert was, in essence, an unfixed musical performance that in itself is not copyrightable. *See, e.g.*, 3 Nimmer on Copyright § 8E.05 (explaining that "singing in a concert hall, without the presence of any type of recording equipment, unquestionably is not [fixed]," and therefore not subject to copyright protection). It is only when the concert is "fixed" in a tangible medium of expression that it becomes a work protected by copyright. *See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 632 (2d Cir. 2004) (finding that, "[l]ike other creative works, dances are available for statutory copyright if 'fixed in any tangible medium of expression,'" such as if "they have been filmed or videotaped") (quoting 17 U.S.C. § 102(a)).

By zeroing in on Bernstein's contributions to the filming of the concert rather than his efforts as a producer and promoter of the event, it is obvious that he is not an "author" of any fixed works. The Complaint alleges that Bernstein came up with the idea of the concert and was heavily involved in the logistics of setting it up. (Compl. ¶ 15.) (*See also* Oral Arg. Tr. at 48) (describing Bernstein's creative contributions as "where to put the stage in the stadium . . . placement of the microphones, things like that.")  At the same time, the Complaint acknowledges that Nems and Sullivan Productions filmed the concert and produced *The Beatles at Shea Stadium* Movie, while Bernstein never even had access to the footage. (Compl. ¶ 36.)  Put simply, this sort of conduct does not make Bernstein an "author" of any copyrightable works. *See Garcia*, 786 F.3d at 743 (rejecting plaintiff's copyright claim because "[s]he never fixed her acting performance in a tangible medium").[11]  As such, all of SBP's authorship claims fail.

### ii.  Works Made-For-Hire

Plaintiff has also asserted that Bernstein owns copyrights in the "Master Tapes" through a work-for-hire theory. "Where a work is 'made for hire,' copyright law deems the *employer* to be the 'author' for purposes of copyright ownership." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 137 (2d Cir. 2013) (citing Copyright Act of 1909 § 62) (emphasis in original).  Thus, the "copyright belongs to the person at whose 'instance and expense' the work was created." *Martha Graham*, 380 F.3d at 634-35. "'Instance' refers to the extent to which the hiring party provided the impetus for, participated in, or had the power to supervise the creation of the work." *Kirby*, 726 F.3d at 139. "The 'expense' component refers to the resources the hiring party invests in the creation of the work." *Id.*

---

[11] There is also no showing that the parties intended to be joint authors. *See Thomson*, 147 F.3d at 200 ("A co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors.") (citing *Childress v. Taylor*, 945 F.2d 500, 501, 507-08 (2d Cir. 1991)).

SBP articulates its work-for-hire theory as follows: because Bernstein was The Beatles' "employer for hire, the copyrightable contributions made by The Beatles and the opening acts to the work embodied in the Master Tapes vested *ab initio* in Bernstein as a matter of law." (Opp'n Mem. at 8.)  Again, "the work" purportedly created by Bernstein is not the unedited film of the concert; rather, it is the overall performance that was "embodied in the Master Tapes." (Compl. ¶ 41.)  That distinction helps explain why SBP's argument focuses so much on the contributions Bernstein made to the overall concert rather than the filming of it.  (*See* Opp'n Mem. at 9) ("Bernstein paid the Beatles and opening acts, and personally financed virtually every aspect of the concert. . . .  Bernstein made substantial monetary outlays to mount the concert and bore the risk that his portion of the money taken in at the concert would not cover his expenses.")

For largely the same reasons as discussed above, this theory is misguided and fails on multiple grounds.  The relevant legal question is not the extent to which Bernstein contributed to or financed the 1965 concert; rather, it is the extent to which he "provided the impetus for" and invested in *a copyrightable work—e.g.*, the concert film.  The Complaint and relevant contracts clearly refute any such claim by Bernstein.  By the express terms of the Nems-Bernstein Contract, Bernstein had no control over the filming of the concert. (Nems-Bernstein Contract ¶ 4.)  Further, while the Complaint asserts that Bernstein made financial outlays with regard to the concert, it was Nems that paid Sullivan Productions to create the film.  (Compl. ¶ 14.)  Indeed, the agreement between Nems and Sullivan expressly stated that Nems owned the copyright in *The Beatles at Shea Stadium* Movie. (Nems-Sullivan Contract ¶ 8.)  SBP has simply made no showing that could plausibly satisfy this test.  Accordingly, all of Plaintiff's claims must be dismissed.[12]

---

[12] Although Plaintiff's counsel suggested at oral argument that the Fifth Claim for Relief could survive even if Plaintiff is found to lack ownership in the "Master Tapes" or the Movie, (Oral Arg. Tr. at 93-94), this Court dismisses that claim as well for the reasons stated herein.

## IV.   DEFENDANTS' MOTION FOR SANCTIONS IS DENIED

Defendants argue that Plaintiff's counsel, Curry Law, should be sanctioned under Rule 11(b)(2) of the Federal Rules of Civil Procedure for submitting a complaint with patently frivolous legal claims, and that Plaintiff and Curry Law should be sanctioned under Rule 11(b)(1) and (b)(3) for presenting factual contentions that lack evidentiary support and filing a complaint for improper purposes. (Defs.' Mem. L. Supp. Sanctions, ECF No. 26, at 6.)

A motion or other filing violates Rule 11 when it "has been interposed for any improper purpose, *or where*, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and [is] warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *W.K. Webster & Co. v. Am. President Lines, Ltd.*, 32 F.3d 665, 670 (2d Cir. 1994) (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985) (emphasis in original)).   Rule 11 "is targeted at situations 'where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands.'" *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1005 (2d Cir. 1988) (quoting *Eastway*, 762 F.2d at 254).   The Second Circuit has "stressed that 'any and all doubts must be resolved in favor of the signer.'" *Id.* (quoting *Eastway*, 762 F.2d at 254).

Although Plaintiff has failed to state a plausible claim, the filings do not support a conclusion that the claims were clearly frivolous or were alleged in bad faith.   "An argument constitutes a frivolous legal position for purposes of Rule 11 sanctions if, under an objective standard of reasonableness, it is clear . . . that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995) (quoting *Caisse Nationale de Credit Agricole-CNCA, New York Branch v.*

*Valcorp, Inc.*, 28 F.3d 259, 264 (2d Cir. 1994)). "The fact that a legal theory is a long-shot does not necessarily mean it is sanctionable." *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011). That Plaintiff's claims failed to pass the motion-to-dismiss threshold does not mean that they clearly had no chance of success and that there was no reasonable argument to extend the law as it stood at the time of filing. *See, e.g., In re Merrill Lynch Tyco Research Sec. Litig.*, No. 03-CV-4080, 2004 WL 305809, at *5 (S.D.N.Y. Feb. 18, 2004).  Nor have Defendants established that Plaintiff or its counsel acted with improper motive.

This Court does not find that any party or attorney to this action has violated Rule 11. Defendants' motion for sanctions is DENIED.

### V.    CONCLUSION

Defendants' motion to dismiss the Complaint, with prejudice, is GRANTED.  The Complaint is dismissed in its entirety.  Defendants' motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure is DENIED.

The Clerk of Court is instructed to close the motions at ECF Nos. 19 and 25 and this case.

Dated: July __, 2017    JUL 2 6 2017
New York, New York

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge